## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## BOWLING GREEN DIVISION
## CIVIL ACTION NO. 1:07-CV-00185-M

**HOLLEY PERFORMANCE PRODUCTS, INC.**                                **PLAINTIFF**

**V.**

**QUICK FUEL TECHNOLOGY, INC.,**
**MARVIN V. BENOIT, JR.,**
**SPECIALTY AUTO PARTS U.S.A., INC.,**
**d/b/a PROFORM, and RICHARD B. PLATT**                           **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on the Motion of Defendants Specialty Auto Parts U.S.A., Inc., d/b/a Proform, and Richard Platt to Dismiss with Prejudice Counts XV and XVI and Related Claims Contained in Count XVII of the Fourth Amended Complaint [DN 258]. Fully briefed, this matter is ripe for decision.

### I. BACKGROUND

Plaintiff manufactures high-performance carburetors for use in street and racing automobiles. It has been in the business of manufacturing and selling carburetors in the United States since 1903. (Compl. ¶ 24.) Defendants Quick Fuel Technology, Inc. and Specialty Auto Parts U.S.A., Inc., d/b/a Proform, also manufacture and sell high-performance carburetors. (Id. ¶¶ 5, 7.) The parties' high-performance carburetors are sold, in part, through the stores, catalogs, and websites of warehouse distributors ("WDs"). (Compl. ¶ 85.) Visibility in these stores, catalogs, and websites is necessary to be competitive in the high-performance carburetor market. (Id. ¶ 86.) Since WDs are only willing to expend their resources to promote a limited number of brands at a given price, manufacturers of high-performance carburetors compete for advantageous space and displays. (Id. ¶¶ 90–92.)

Plaintiff alleges that Defendants Quick Fuel and Proform agreed between themselves to set the prices they would charge for their race-series and street-series lines of carburetors. (Compl. ¶¶ 93–94, 97.) Specifically, Plaintiff alleges that Defendants agreed to price their respective race-series and street-series carburetors at a $30 and $50 difference between the two brands. (Id.) According to Plaintiff, the purpose of Defendants' agreement to fix this price-spread was to "force many warehouse distributors to purchase both Quick Fuel and Proform products, as well as to focus their efforts on Proform and Quick Fuel products, to the exclusion of Holley products." (Id. ¶ 100.)

## II. STANDARD OF REVIEW

Upon a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), a court "must construe the complaint in the light most favorable to plaintiff[]," League of United Latin Am. Citizens v. Bredesen, 500 F.3d 523, 527 (6th Cir. 2007) (citation omitted), accepting all plaintiff's allegations as true. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). Under this standard, the plaintiff must provide the grounds for its entitlement to relief, which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). A plaintiff satisfies this standard only when it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. A complaint falls short if it pleads facts that are merely "consistent with a defendant's liability" or if the facts do not "permit the court to infer more than the mere possibility of misconduct." Id. at 678–79. Instead, the allegations must "'show[] that the pleader is entitled to relief.'" Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

To plead a civil antitrust lawsuit under § 1 of the Sherman Act, "a plaintiff may allege either an explicit agreement to restrain trade, or 'sufficient circumstantial evidence tending to exclude the

possibility of independent conduct.'" Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc., 648 F.3d 452, 457 (6th Cir. 2011) (citation omitted). Under either approach, "the facts alleged must plausibly suggest[], rather than be merely consistent with, an agreement to restrain trade in violation of the Sherman Act." Id. (internal quotation marks omitted). In the Sixth Circuit, "[t]wo analytical approaches are used to determine whether a defendant's conduct unreasonably restrains trade: the *per se* rule and the rule of reason." Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club, 325 F.3d 712, 718 (6th Cir. 2003) (citation omitted).

"The *per se* rule identifies certain practices that 'are entirely void of redeeming competitive rationales.'" Nat'l Hockey League Players' Ass'n, 325 F.3d at 718. When a court determines that a practice is illegal *per se*, "no examination of the practice's impact on the market or the procompetitive justifications for the practice is necessary for finding a violation of antitrust law." Id. By contrast, the rule of reason "requires a court to analyze the history of the restraint and the restraint's effect on competition." Id. Horizontal price-fixing agreements and horizontal market allocation agreements are *per se* violations. See, e.g., Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 212 (1959). Vertical agreements are adjudicated under the rule of reason. See, e.g., Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 907 (2007).[1]

However, proof of a violation of an antitrust law is insufficient, as a private plaintiff must also demonstrate he was "injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15 (2006). The Supreme Court has held that this language means that

---

[1] Horizontal price-fixing agreements are restraints of trade "imposed by agreement between competitors at the same level of distribution." Black's Law Dictionary (9th ed. 2009). By contrast, vertical price-fixing agreements are restraints of trade "imposed by agreement between firms at different levels of distribution (as between manufacturer and retailer)." Id.

3

all private plaintiffs must "prove antitrust injury," which is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). Accordingly, an antitrust lawsuit by a private plaintiff cannot survive a motion to dismiss unless the plaintiff has alleged antitrust injury, which is a matter of antitrust standing. See NicSand Inc. v. 3M Co., 507 F.3d 442, 449–50 (6th Cir. 2007) (noting that antitrust standing "is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement [the courts] must dismiss it as a matter of law"). This is true regardless of whether the *per se* rule or the rule of reason applies. See Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 341–42 (1990) (rejecting a presumption of antitrust injury in *per se* cases and requiring private plaintiffs to prove antitrust injury in every case).

The requirement of antitrust injury "means that one competitor may not use the antitrust laws to sue a rival merely for vigorous or intensified competition." NicSand Inc., 507 F.3d at 450. In other words, the requirement "ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." Atlantic Richfield Co., 495 U.S. at 344. Thus, even though a plaintiff alleges that an injury is causally related to an antitrust violation, that injury "will not qualify [as 'antitrust injury'] unless it is attributable to an anticompetitive aspect of the practice under scrutiny." Id. at 334.

### III. DISCUSSION

Plaintiff has brought several causes of action against Defendants. These causes include one for conspiring to fix prices (Count XV) and one for allocating markets and customers (Count XVI).

4

Plaintiff also asserts a common law civil conspiracy cause of action (Count XVII).[2]  Defendants move to dismiss Counts XV and XVI, and XVII under Rule 12(b)(6).

### A. COUNT XV: CONSPIRACY TO FIX PRICES

In Count XV of its Fourth Amended Complaint, Plaintiff contends that Defendants have conspired "to fix prices for high-performance carburetors sold to automobile enthusiasts." (Compl. ¶ 186.)  In response, Defendants begin by asserting that the Court must apply the rule of reason when analyzing this Count, as Quick Fuel and Proform are in a dual distribution relationship, with Quick Fuel acting as both a manufacturer and a distributor of its carburetors and Proform acting as a distributor of Quick Fuel-made carburetors under the Proform label.  (See Mem. of Law in Supp. of Defs. Specialty Auto Parts U.S.A., Inc. & Richard Platt's Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) [DN 259] 18.)  According to Defendants, while dual distribution arrangements have some horizontal elements, the Sixth Circuit mandates that they be adjudicated under the rule of reason.  See Int'l Logistics Grp., Ltd. v. Chrysler Corp., 884 F.2d 904, 906 (6th Cir. 1989) (noting that "vertical restraints involving dual distribution will be analyzed in the same manner as other vertical restraints" and finding that cases "involving dual distribution have sometimes erroneously been characterized as horizontal, and subjected to a *per se* analysis").  If the rule of reason applies, the Court is required to analyze the history of the restraint and its effect on competition.  A prima facie case under the rule of reason requires facts sufficient to prove:

> (1) that the antitrust defendant contracted, combined, or conspired; (2) that the combination or conspiracy produced adverse anticompetitive effects (3) within relevant product and geographical markets; (4) that the objects of and conduct

---

[2] The Court notes that Holley has settled its claims with Quick Fuel and Marvin V. Benoit, Jr.  (See Joint Mot. to Dismiss Claims of Pl./Counter-Def. Holley Performance Prods., Inc. & Defs./Counter-Pls. Quick Fuel Tech., Inc. & Marvin V. Benoit, Jr. with Prejudice [DN 300] 1.)

> pursuant to that contract or conspiracy were illegal; and (5) that the plaintiff was injured as a proximate result of that conspiracy.

Churchill Downs Inc. v. Thoroughbred Horsemen's Grp., LLC, 605 F. Supp. 2d 870 (W.D. Ky. 2009) (citing Int'l Logistics Grp., Ltd., 884 F.2d at 907). Because Defendants believe that Plaintiff failed to supply the facts to prove these elements, they argue that Count XV must be dismissed.

Defendants also maintain that Count XV must be dismissed because Plaintiff, as a competitor of Defendants, suffered no antitrust injury from its rivals' illegal pricing practices. Defendants note that if their price-fixing agreement resulted in prices that were above Plaintiff's prices, there was no antitrust injury because Plaintiff would actually benefit. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 582–83 (1986) (holding that charging higher than competitive prices "would indeed violate the Sherman Act" but "could not injure respondents" as they "stand to gain from any conspiracy to raise the market price"). Conversely, if Defendants' price-fixing agreement resulted in prices that were below Plaintiff's prices, there was no antitrust injury because the prices were not predatory (i.e. they were not below-cost). See Atlantic Richfield Co., 495 U.S. at 339 (noting that in the context of pricing practices, "only predatory pricing has the requisite anticompetitive effect" and further noting that if prices "are above predatory levels, they do not threaten competition"). According to Defendants, since Plaintiff failed to allege predatory pricing, Count XV must be dismissed.

Plaintiff counters that the Court should not dismiss Count XV because it has alleged a *per se* violation of the antitrust laws by pleading facts that demonstrate the existence of a group boycott through the implementation of two horizontal conspiracies. (See Holley's Combined Resp. in Opp. to Defs.' Mot. to Dismiss [DN 274] 5–6.) According to Plaintiff, the first is a horizontal conspiracy between Quick Fuel and Proform to fix a price-spread between their carburetors. (Id. at 6.) The

6

second is a horizontal conspiracy between the warehouse distributors ("WDs") to boycott Plaintiff, which conspiracy was either "forced" on the WDs by Defendants or entered into voluntarily. (Id. at 7–9.) In support of its argument that it has demonstrated the existence of a group boycott, Plaintiff references its allegation that Defendants were straightforward with the WDs about their coordinated pricing scheme and the WDs did not question the strategy. (See Compl. ¶ 104.) Plaintiff also cites language in e-mails from Proform to Quick Fuel which states that WDs would "have no choice but to purchase" their carburetors, (id. at ¶ 100), as well as its allegation that causing WDs "by force or by collusive agreement with the WDs to purchase both Proform and Quick Fuel carburetors, and to focus their efforts on Proform and Quick Fuel products, results in the exclusion of other brands for limited market resources of WDs." (Id. at ¶ 107.) Plaintiff asserts that since it has demonstrated the existence of a group boycott, the *per se* rule applies. According to Plaintiff, since the *per se* rule applies, the Court is not required to analyze the history of the restraint or its effect on competition. See Nat'l Hockey League Players' Ass'n, 325 F.3d at 718. Further, since Plaintiff has presented a group boycott theory, the Court should not analyze antitrust injury on the basis of whether Plaintiff alleged predatory pricing. Instead, the Court should focus on whether Plaintiff alleged exclusionary conduct by Defendants and the WDs. For the following reasons, the Court finds that Defendants' motion must be **GRANTED**.

At the outset, the Court notes that it finds it unnecessary to conclude whether the actions at issue should be subjected to a *per se* or rule of reason analysis. Thus, it will not address Defendants' argument that their relationship should be characterized as one of dual distribution. Case law in the Sixth Circuit is clear that all private plaintiffs must allege antitrust injury, regardless of whether the rule of reason or the *per se* rule applies. As discussed below, Plaintiff fails to make this allegation.

7

The requirement of antitrust injury "means that one competitor may not use the antitrust laws to sue a rival merely for vigorous or intensified competition." NicSand Inc., 507 F.3d at 450. In other words, it "ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." Atlantic Richfield Co., 495 U.S. at 344. Accordingly, even though a plaintiff alleges that an injury is causally related to an antitrust violation, that injury "will not qualify [as 'antitrust injury'] unless it is attributable to an anticompetitive aspect of the practice under scrutiny." Id. at 334. All private plaintiffs must allege antitrust injury regardless of whether the *per se* rule or rule of reason applies. See id. at 341–42 (rejecting a presumption of antitrust injury in *per se* cases and requiring private plaintiffs to prove antitrust injury in every case).

With respect to Defendants' price-fixing agreement, the Court finds that Plaintiff's allegations do not allege an antitrust injury as a matter of law. In its Fourth Amended Complaint, Plaintiff asserts that it suffered injury due to Defendants' price-fixing agreement since it was forced to "offer more incentives, including higher distribution margins, to warehouse distributors to achieve the appropriate product placement in the warehouse distributors' stores, catalogs and web pages, as well as to encourage the employees of the warehouse distributors to sell Holley carburetors." (Compl. ¶ 108.) But as Defendants correctly highlight, with respect to the price-spread that was allegedly set by Defendants, Plaintiff could not have suffered antitrust injury. As to the prices set at the high end of the price-spread, Plaintiff stood to benefit, as it could simultaneously raise its prices. See Matsushita Elec. Indus. Co., 475 U.S. at 582–83 (holding that charging higher than competitive prices "could not injure respondents" as they "stand to gain from any conspiracy to raise the market price"). Conversely, as to the prices set at the low end of the price-spread, as long as the prices were not predatory, Plaintiff could not have suffered antitrust injury. See Atlantic Richfield

8

Co., 495 U.S. at 339 (noting that in the context of pricing practices, "only predatory pricing has the requisite anticompetitive effect"). Essentially, Plaintiff alleges in its Fourth Amended Complaint that it was injured because it was required to offer the WDs additional incentives to remain competitive with Defendants. This injury stems from increased competition and is not a cognizable antitrust injury under antitrust laws.

Moreover, with respect to Plaintiff's claim that it suffered antitrust injury because Defendants raised its costs, the Court finds that Plaintiff's citation to Re/Max International, Inc. v. Realty One, Inc., 173 F.3d 995 (6th Cir. 1999), is off point. There, Re/Max alleged that real estate brokerages agreed among themselves to implement an unfair commission policy to boycott Re/Max, which paid its real estate agents the commissions earned on its sales. Id. at 1103. Instead of following the usual practice among brokerages in which the seller's agent and the buyer's agent split the commission 50-50%, the brokerages' agents required Re/Max's agents to receive only 25-30% of the overall commission. Id. This policy discouraged the real estate agents working for Re/Max. The Court held that the brokerages' exclusionary conduct "imposed additional costs" on Re/Max, as Re/Max had to "pay even more to its agents if it wanted to keep them." Id. at 1014. Thus, Re/Max was injured even though the brokerages did not completely shut Re/Max out of business. Id. Plaintiff asserts that Defendants' exclusionary practices similarly injured it, causing it to have to raise its costs. But the Court finds that Re/Max is inapposite, as Re/Max suffered a true, additional cost–namely, the increase in payment to its agents–while Plaintiff's alleged cost is directly tied to its having to discount the price of its products to attract the WDs and, ultimately, customers. The Supreme Court has long held that reducing price in this fashion is not an antitrust injury. See, e.g., Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 116 (1986) ("To hold that the

antitrust laws protect competitors from the loss of profits due to [non-predatory] price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share."). Plaintiff cannot contort its reduced revenues into a cost. Since it has only alleged that it was required to give more incentives to the WDs, which reduced its revenue, it has not pled antitrust injury.

Inasmuch as the Plaintiff does not allege predatory pricing in its Fourth Amended Complaint, the Court finds that Count XV should be dismissed as a matter of law for lack of an antitrust injury. However, because Plaintiff insists that Count XV is based on more than Defendants' price-fixing agreement–instead, it is based on a group boycott, wherein Defendants and the WDs engaged in conduct that was designed to exclude Plaintiff from the market–the Court will address whether Plaintiff adequately pled antitrust injury by asserting a group boycott theory in its Fourth Amended Complaint. The Court determines that it did not.

Plaintiff correctly states that "[e]vidence of a group boycott used to effectuate a price-fixing arrangement is sufficient to support a *per se* violation." Churchill Downs Inc., 605 F. Supp. 2d at 890. Group boycotts are "designed to 'pressure' another party into doing something by 'withholding, or enlisting others to withhold, patronage or services from the target.'" Id. (quotation omitted). If Plaintiff properly alleged a group boycott in its Fourth Amended Complaint, it is clear that it would "ha[ve] standing to challenge the conduct of [Defendants] . . . because [such conduct] tends to exclude rivals from the market." IIA Phillip E. Areeda et al. Antitrust Law 202 (3d ed. 2007). However, a careful review of Plaintiff's Fourth Amended Complaint reveals that no **facts** are alleged which support a group boycott theory.

"For purposes of standing analysis, the Court must assume two things: that the facts in the

complaint to [sic] are true, and that Plaintiffs' antitrust theory is supported by facts that actually amount to antitrust violations." Churchill Downs Inc., 605 F. Supp. 2d at 880. But in this case, the Fourth Amended Complaint does not allege an antitrust theory of price-fixing perpetrated by group boycott. In this regard, the Court notes that the phrase "group boycott" is nowhere found in the Fourth Amended Complaint. Indeed, while the Complaint focuses greatly on the price-fixing agreement between Defendants, it does not even mention a conspiracy between the WDs to prefer Defendants' carburetors to the exclusion of Plaintiff's. Also, Plaintiff simply fails to allege any facts supporting a group boycott theory. It does not allege that Defendants or the WDs boycotted its products. It does not allege a single fact about the participants, scope, duration, or details of the WDs' conspiracy. Plaintiff fails to allege that it sought to sell its products to the WDs but was denied the opportunity to do so–or that it was told by the WDs that its carburetors would be excluded unless Plaintiff lowered its prices or offered greater incentives. While Plaintiff broadly asserts that it will be "excluded" from the market, (Compl. ¶ 188), it alleges no facts in support of that notion. The Fourth Amended Complaint is devoid of any facts which suggest that Plaintiff was excluded or prevented from enjoying the WDs' promotion and marketing efforts. Likewise, it is devoid of any facts which suggest that the WDs were contractually precluded from buying from Plaintiff.

     The Court notes that at the heart of Plaintiff's argument is the belief that the Court should infer a conspiracy between the WDs based on the facts found in the Fourth Amended Complaint. The Court finds, however, that Plaintiff's citation to cases where the plaintiffs pleaded sufficient facts to infer conspiracies are inapposite. For example, Plaintiff relies heavily on both Klor's, Inc. v. Broadway-Hale, Inc., 359 U.S. 207 (1959), and Toys "R" Us, Inc. v. FTC, 221 F.3d 928 (7th Cir.

2000) to support its claim that the Court should deny Defendants' motion and apply the *per se* rule. In Klor's, the Supreme Court found a horizontal group boycott *per se* illegal when Broadway-Hale coerced several manufacturers of appliances and their distributors not to deal with Klor's–or to only sell to Klor's at discriminatory prices or unfavorable terms. 359 U.S. at 209. In so doing, the Court partially relied on Broadway-Hale's "monopolistic tendency," which made the claim that it could force others into a boycott plausible. Id. at 213. By contrast, in Toys "R" Us, Inc., the Seventh Circuit found a group boycott *per se* illegal when Toys "R" Us sought to impose restrictions on the toys sold by its rivals through agreements with toy manufacturers. 221 F.3d at 930. While there was no evidence of an explicit agreement between the toy manufacturers, the circumstantial evidence proved a conspiracy since non-participating manufacturers would gain a special advantage with the rivals unless all manufacturers participated in the boycott. In other words, there was evidence that each individual toy manufacturer agreed to Toys "R" Us's scheme only after it was assured by Toys "R" Us that its competitors had also agreed. Id. at 936. Notably, the plaintiffs–namely, the rivals of Toys "R" Us–presented evidence of a shift in the output of toys away from them. Id. at 937. This evidence tended to prove that exclusion from the market was occurring.

In the present case, however, Plaintiff did not allege in its Fourth Amended Complaint that the WDs stopped dealing with Plaintiff, sold to it at discriminatory prices or only on unfavorable terms, marketed its carburetors in an undesirable fashion, or refused to allow it to advertise in its stores, on its websites, or in its catalogs. Also, Plaintiff did not allege facts showing that Defendants had power to force the WDs into action, that there were communications among the WDs regarding a boycott, or that unilateral purchases of Defendants' carburetors would be unprofitable and would make sense only if the other WDs participated in Defendants' scheme. Plaintiff similarly failed to

allege a shift in sales away from its carburetors or in favor of Defendants' carburetors. Without these types of allegations, the present case is distinguishable from Klor's and Toys "R" Us. Unlike those cases, Plaintiff failed to present detailed circumstantial evidence as to the alleged conspiracies.

Additionally, with respect to antitrust injury, the Court wishes to address Plaintiff's claim that the Court "should assume that an antitrust violation has occurred, and that the plaintiff could so prove." First Med. Reps., LLC v. Futura Med. Corp., 195 F. Supp. 2d 917, 923 (E.D. Mich. 2002). In this regard, the Court notes that the Sixth Circuit has held that to show antitrust injury, a competitor "must at least allege that exclusion of the competitor from the marketplace results in the elimination of a superior product or a lower-cost alternative." Indeck Energy Serv. v. Consumers Energy Co., 250 F.3d 972, 977–78 (6th Cir. 2000). As discussed above, Plaintiff has not alleged sufficient facts to suggest that there was exclusion–let alone to prove that its product was eliminated from the market. While Plaintiff is correct that it is not required to plead that it was completely shut out of the market, see Re/Max Int'l, Inc., 173 F.3d at 1014–15 (recognizing an antitrust violation where the defendants did not completely shut out the boycotted entity from the market), it seems to overlook that it must plead more than conclusory allegations. Sixth Circuit law provides that allegations must "be specific enough to establish the relevant 'who, what, where, when, how or why'" and "specify how [each] defendant [was] involved in the alleged conspiracy." Carrier Corp. v. Outokumpu Oyj, 673 F.3d 430, 445 (6th Cir. 2012) (citation omitted). Here, while Plaintiff adequately pled facts establishing the existence of a conspiracy between Quick Fuel and Proform, it did not plead facts establishing the existence of a group boycott, nor did it plead facts establishing Plaintiff's exclusion from the market.

In sum, the Court agrees with Defendants that Plaintiff's group boycott theory was not pled

in the Fourth Amended Complaint. Without a sufficiently pled group boycott theory, Plaintiff cannot claim that it suffered antitrust injury due to exclusionary conduct. Plaintiff's attempt to introduce a group boycott theory in its Response does not save Count XV from dismissal. New theories of relief raised in opposition briefs to motions to dismiss are not to be considered by courts. See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 449 (6th Cir. 2011) (holding that "matters beyond the pleadings . . . cannot be considered on a Rule 12(b)(6) motion"); see also Jung v. Ass'n of Am. Med. Colleges, 300 F. Supp. 2d 119, 163 (D.D.C. 2004) (noting that it is "axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss") (citation omitted); Morris v. Equi First Corp., 2011 WL 1337404, at *6 (M.D. Tenn. Apr. 7, 2011) (noting that "the plaintiff cannot amend his pleadings to set forth unpled claims through a response to a motion to dismiss"). Despite Plaintiff's efforts to now craft and assert a group boycott theory, the fact remains that the Fourth Amended Complaint does not contain allegations of such a theory. Therefore, Count XV must be **DISMISSED** under Rule 12(b)(6).

### B. COUNT XVI: CONSPIRACY TO ALLOCATE MARKETS AND CUSTOMERS

In Count XVI of its Fourth Amended Complaint, Plaintiff alleges that Defendants agreed to allocate customers and markets by allocating Proform carburetors "to automobile enthusiasts willing to pay a lower price" and Quick Fuel carburetors "to automobile enthusiasts wanting to pay a higher price." (Compl. ¶¶ 193–94.) Defendants assert that this Count must also be dismissed because it is predicated on Defendants' price-fixing agreement and there is no antitrust injury. As is the case with Count XV, the Court agrees with Defendants that Count XVI is predicated solely on Defendants' price-fixing agreement, as Plaintiff has not adequately alleged a group boycott theory and has not adequately pled facts establishing exclusion from the market. Also, the Court agrees

with Defendants that Plaintiff did not plead antitrust injury. Therefore, Count XVI must be **DISMISSED** under Rule (12)(b)(6).

The Court notes that while "[i]t is one thing to be cautious before dismissing an antitrust complaint in advance of discovery," it is "another to forget that proceeding to antitrust discovery can be expensive." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 546 (2007). "Dismissal for failure to show antitrust standing is appropriate at an early stage." Churchill Downs Inc., 605 F. Supp. 2d at 879 (citing NicSand, Inc., 507 F.3d at 449, 450). Indeed, given the limited "success of judicial supervision in checking discovery abuse" and "the threat [that] discovery expense will push cost-conscious defendants to settle even anemic cases before reaching those proceedings," id. at 1967, the Sixth Circuit been "reasonably aggressive" in weeding out meritless antitrust claims at the pleading stage. See Valley Prods. Co. v. Landmark, 128 F.3d 398, 403 (6th Cir.1997). Since Plaintiff's antitrust claims are meritless, the Court dismisses them for lack of antitrust standing under Rule 12(b)(6). Defendants' motion as to Count XVI is **GRANTED**.

### C. COUNT XVII: CIVIL CONSPIRACY TO DEFRAUD AND DECEIVE AND TO ENGAGE IN UNFAIR COMPETITION

In Count XVII of its Fourth Amended Complaint, Plaintiff alleges that Defendants "conspired to defraud and deceive both the consuming public and Holley." (Compl. ¶ 200.) This claim is based on the belief that "Defendants' concealment, suppression and omission to disclose their price-fixing agreement from Holley as well as from the automotive enthusiasts purchasing high-performance carburetors was a fraudulent misrepresentation and concealment" in the sense that "Holley and the consumers for high-performance carburetors naturally would believe that Defendants were separate and independent competitors in terms of the pricing of high-performance carburetors." (Id. ¶ 205.) It is also based on the belief that Defendants have "conspired to compete

unfairly" and "injure Holley by, among other things, taking its business, impairing its good will, and unfairly profiting by the use of Holley's trade dress and trademarks to exploit Holley's good will." (Id. ¶¶ 216, 217.)

Defendants assert that the Court should dismiss Count XVII because civil conspiracy is not independently actionable under Kentucky law and the underlying tort on which Plaintiff's claim is based–namely, fraud by omission–fails. Defendants also assert that allegations of unfair competition through infringement of trade dress fail to meet the "heightened pleading standards" of Twombly and Iqbal. Plaintiff counters that the Court should not dismiss Count XVII, as Defendants conspired to accomplish the lawful goal of driving Plaintiff from the market through the unlawful means of acting as though they were independent actors competing with Plaintiff. According to Plaintiff, this Count is not entirely based on any one of the actions addressed in Plaintiff's Fourth Amended Complaint and should not be dismissed. See Helton v. Am. Gen. Life Ins. Co., 2010 WL 2889666, at *4 (W.D. Ky. July 21, 2010) (refusing to dismiss a civil conspiracy claim that was based on some, but not all, of the conduct that formed the basis for other counts in the complaint).

Under Kentucky law, a "conspiracy" is defined as "a corrupt or unlawful combination or agreement between two or more persons to do by concert of action an unlawful act, or to do a lawful act by unlawful means." James v. Wilson, 95 S.W.3d 875, 897 (Ky. App. 2002) (quoting Smith v. Board of Educ. of Ludlow, 94 S.W.2d 321, 325 (Ky. App. 1936)). A claim for civil conspiracy "is not a free-standing claim." Stonestreet Farm, LLC v. Buckram Oak Holdings, N.V., 2010 WL 2696278, at *13 (Ky. App. July 9, 2010); see also Hogan v. Goodrich Corp., 2006 WL 149011, at *5 (W.D. Ky. Jan. 17, 2006) (recognizing that "to state a valid claim for civil conspiracy, the plaintiff must sufficiently allege that an underlying wrong existed"). Instead, civil conspiracy

16

"merely provides a theory under which a plaintiff may recover from multiple defendants for an underlying tort." Id. Thus, "if a claim for the underlying tort fails, so does the claim for civil conspiracy." Walker v. Carter Cnty., Ky., 2011 WL 845780, at *6 (E.D. Ky. Feb. 15, 2011).

In this case, there are two underlying wrongs upon which Plaintiff's civil conspiracy claim is based. The first wrong is Defendants' fraudulent concealment and failure to disclose the price-fixing to Plaintiff or to consumers. (Compl. ¶¶ 199–215.) The second wrong is that Defendants competed unfairly by using Plaintiff's trade dress and trademarks to exploit Plaintiff's goodwill. (Id. ¶¶ 216–19.) For the following reasons, the Court finds that each underlying wrong fails to properly support Plaintiff's civil conspiracy claim. Therefore, Count XVII must be **DISMISSED**.

Plaintiff first argues that its civil conspiracy claim is grounded in fraud, arising as a result of Defendants' failure to provide information. (See Holley's Combined Resp. [DN 274] 28.) Under Kentucky law, the tort of fraud by omission requires allegations that Defendants: "(1) had a duty to disclose a material fact; (2) failed to disclose that fact; (3) which induced the plaintiff to act; and (4) the plaintiff suffered actual damages as a result." Wallace v. Midwest Fin. & Mort. Serv., Inc., 728 F. Supp. 2d 906, 923–24 (E.D. Ky. 2010). Thus, for Plaintiff to have a cause of action for fraud by omission, it must allege that Defendants had a duty to disclose the price-fixing to Plaintiff. See id.; see also Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc., 113 S.W.3d 636, 641 (Ky. App. 2003). A duty arises "where a confidential or fiduciary relationship between the parties exists, or when a statute imposes such a duty, or when a defendant has partially disclosed material facts to the plaintiff but has created the impression of full disclosure." Wallace, 728 F. Supp. 2d at 923–24.

Here, Plaintiff concedes that there was no confidential or fiduciary relationship between the parties by stating that a business "would generally have no duty to disclose its business strategy to

17

a competitor . . . ." (Holley's Combined Resp. [DN 274] 29.)  Moreover, Plaintiff does not argue that a statute imposes a duty on Defendants.  Nevertheless, Plaintiff maintains that a duty arose because Defendants "made representations in the marketplace they knew would reach Holley" which were "materially incomplete" because they "only partially disclosed material facts to Holley about their plan to attack Holley's market position while simultaneously creating an impression of disclosure." (Id. at 27–29.)  The Court finds this argument unpersuasive.  There are no allegations in the Fourth Amended Complaint that Defendants made a partial disclosure to Plaintiff.  Moreover, Plaintiff never states what incomplete material facts were actually represented to Plaintiff that triggered the need for further disclosure.

The only case Plaintiff cites to support its assertion that Defendants owed Plaintiff a duty is not applicable.  In Associated Warehousing, Inc. v. Banterra Corp., 2008 WL 4180260, at *4 (W.D. Ky. Sept. 8, 2008), a borrower sought financing for a construction project, which included the need for a Letter of Credit from a rated bank.  The defendant bank was not rated, but it failed to disclose this to the borrower.  The borrower alleged that it was injured due to this failure, and the court denied the bank's motion to dismiss.  Id.  However, the Court finds that there is nothing similar about the duty to disclose that might arise from a bank's relationship with its borrower and a competitor's duty to inform its rival of a business strategy.  Again, the Court notes that Plaintiff never states what facts were represented to Plaintiff that triggered the need for further disclosure. Thus, Plaintiff does not adequately allege that Defendants owed a duty to Plaintiff. Because Plaintiff failed to show that Defendants owed it a duty, the underlying tort of fraud by omission fails. Because the underlying tort of fraud by omission fails, the civil conspiracy claim cannot be upheld on this basis.

Plaintiff also bases its civil conspiracy claim on Defendants' alleged "conspiracy to compete unfairly." (Compl. ¶¶ 216–19.) In Bell Atlantic Corp. v. Twombly, the Supreme Court noted that the crucial question is "whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" 550 U.S. 544, 553 (2007). Thus, allegations of similar or parallel conduct are not enough. Id. at 551–57. Here, Plaintiff bases its civil conspiracy claim on trade dress and trademark infringement. But Plaintiff fails to identify any communications that discuss a conspiracy to commit such infringement. While Plaintiff alleges that there were discussions between Quick Fuel and Proform, facts supporting a conspiracy between Defendants as to infringement on Plaintiff's trade dress are absent from the Fourth Amended Complaint. Dismissal is proper where a plaintiff's allegations of conspiracy are "nothing more than . . . legal conclusion[s] 'masquerading' as . . . factual allegation[s]." See In re Travel Agent Comm'n Antitrust Litig., 583 F.3d 896, 905 (6th Cir. 2009) (citation omitted). In the present case, Plaintiff's allegations in the Fourth Amended Complaint as to a conspiracy to commit trade dress and trademark infringement are nothing more than legal conclusions of conspiracy. Thus, Count XVII must be **DISMISSED**.

### IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that the Motion of Defendants Specialty Auto Parts U.S.A., Inc., d/b/a Proform, and Richard Platt to Dismiss with Prejudice Counts XV and XVI and Related Claims Contained in Count XVII of the Fourth Amended Complaint [DN 258] is **GRANTED**.

*[signature]*

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

cc: counsel of record